Ruggles, C. J.
 

 On the 11th of April 1792, Robert Morris being seised in fee-simple of the premises in controversy, conveyed the same to Charles Williamson, in trust for Sir William Pulteney, an alien. On the 31st of March 1801, Charles Williamson and his wife released the same premises to Sir William Pulteney.
 
 [1]
 
 This release was executed while the act of 2d April 1798 was in force; by the first section of that act it was enacted, “that all and every conveyance or conveyances, hereafter to be made or executed, to any alien or aliens, not being the subject or subjects of some sovereign state or power which is, or shall be, at the time of such conveyance, at war with the United States of America, shall be deemed valid to vest the estate thereby granted in such alien or aliens; and it shall and may be lawful to and for such alien or aliens to have and to hold the same, to his, her or their heirs and assigns for ever, *any plea of alienism to the contrary notwithstand- *- ing: Provided, always, that it shall not be lawful for any such alien, or the heirs or assigns of any such alien,
 
 being aliens,
 
 to reserve any rent or service whatever, upon any grant, lease, demise or conveyance whatsoever to be made of such lands or tenements,” &e. Sir William
 
 *309
 
 Pulteney, therefore, although an alien, took by virtue of the conveyance from Williamson, and by operation of the statute of 1798, a valid title to the lands in question, not only as against strangers, but as against the people of this state.
 

 He died in May 1805, leaving Henrietta Laura Pulteney, his only child and heir-at-law; at the time of his death, his daughter was the wife of Sir James Pulteney. Sir James Pulteney and his wife, by their agent, entered upon and enjoyed the estate during her lifetime. She died in July 1808, without issue, leaving Sir John Lowther Johnstone her heir-at-law, who also went into and remained in possession during his lifetime. He died in December 1811, leaving a will, by which he devised his estate to trustees; the plaintiffs claim under this will.
 

 Henrietta. Laura Pulteney and Sir John Lowther John-stone were aliens; and the first objection to the plaintiffs’ title is, that the land escheated to the people of the state of New York, by reason of the invalidity of either of these aliens to inherit the same. This depends on the construction of the act of 1798 and of
 
 that of 1819
 
 hereafter mentioned.
 

 By the act of 1798, every conveyance thereafter to be made to an alien, vested the estate thereby granted in the alien, and made it lawful for the alien to hold the same to his heirs and assigns for ever, any plea of alien-ism to the contrary notwithstanding. This is the language of the act, when stripped of its redundant words. The defendant’s counsel insists, that although the act removes the disability of the grantee, it does not alter the course of descent, by removing the disability of the alien heirs of the grantee; and that, therefore, none but heirs capable, by the ordinary rules of law, of inheriting, can take as heirs of the grantee.
 

 The construction of the statute is, however, at variance ^ _ with *decisions of the supreme court in similar
 
 1
 
 or analogous cases. In 1802, an act was passed
 
 *310
 
 to enable aliens to purchase and hold real estate within this state, &c. (3 R. S. 343,1st edition.) The first section is as follows:
 
 “
 
 That all purchases of lands, made or to be made by any alien or aliens, who have come to this state and become inhabitants thereof, shall be deemed valid to vest the estate to them granted, and it shall and may be lawful to and for such alien or aliens to have and to hold the same to his, her or their heirs or assigns for ever, and to dispose of the same, any plea of alienism to the contrary thereof notwithstanding.” In 1808 (3 R. S. 344, 1st ed.), the benefit of this statute was extended to all aliens who might have come into this state, and oecome inhabitants thereof, at the close of the session of the legislature of that year. In
 
 Jackson
 
 v.
 
 Adams
 
 (7 Wend. 367), it was held, that lands purchased by an alien who came within these statutes, descended to his alien heirs. “ When the legislature spoke without restriction or qualification of the heirs of an alien, they must mean such heirs as he was then competent to have; and it would be a reproach to the good sense as well as to the good faith of the legislature, to suppose they could have any other meaning.” (Id. 370.)
 

 The statute of 1802 is precisely like the first clause of the act of 1798, so far as respects the inheritance by an alien heir; and both should receive the same construction. This construction is supported and confirmed by the cases
 
 Jackson
 
 v.
 
 Lervey
 
 (5 Cow. 307),
 
 Jackson
 
 v.
 
 Etz
 
 (5 Id. 314), in the supreme court, and
 
 Goodell
 
 v.
 
 Jackson
 
 (20 Johns. 707), in the court for the correction of errors.
 

 But the proviso in the first section of the act of 1798, of itself, dispels all doubt of the intention of the legislature to remove the disability of the alien heirs of the alien grantee. It provides, “ that it shall not be lawful for any such alien,
 
 or the heirs or assigns
 
 of any such alien,
 
 being aliens,
 
 to reserve any rent or service whatsoever to be made of any such lands,” &c. The right of the alien heir to inherit is here recognised in plain terms. By the act of 1708, therefore, the alien heir of the alien grantee is entitled to inherit, and Henrietta * 311 1 ^ Bulteney *the daughter of Sir William J Bulteney, took a valid title to the lands in controversy, on the death of her father.
 

 The next question is, whether Sir John Lowther Johnstone, being her alien heir, was entitled to take the estate by inheritance, on her death. No doubt can be entertained on this point. The statute makes it lawful for the alien grantee to have and to hold the lands
 
 “
 
 to his, her or their heirs for ever, any plea of alienism to the contrary notwithstanding.” The plain intent from these words is, that the alien heirs of the grantee may take in succession one from another, and the words
 
 “
 
 any plea of alienism to the contrary notwithstanding,” apply as well to the heirs of the first heir, as to the first heir himself. Sir John Lowther Johnstone, deriving his title by inheritance from Sir William Bulteney, through his daughter and him, is, within the meaning of the statute, the heir of Sir Willia'm Bulteney. The same reasons which enable the alien grantee to transmit the inheritance to his immediate alien heir, require that such heir should be capable of transmitting it again by inheritance, in like manner, and unless we reject and depart from the reasoning in the case of
 
 Goodell
 
 v.
 
 Jackson,
 
 and the other cases above referred to, the statute must be understood as bestowing upon the land the quality of being inheritable by aliens, until by inheritance, devise or grant, the title should come to a citizen. It could never have been intended, that this inheritable quality should cease at the end of three years from the passing of the act.
 

 If there was originally any ground for controversy on that point, the act of 1819, hereafter mentioned, puts the question to rest. Without other reference, therefore, to the act of 1819, it seems to be clear, that by virtue of the act of 1798 alone, the estate in question, upon the death
 
 *311
 
 of Sir William Pulteney, descended to his daughter, and upon her death, it went by inheritance to Sir John Lowther Johnstone, notwithstanding their alienism.
 

 It is further objected by the defendant, that the trustees, under the will of Sir John Lowther Johnstone, being aliens, could not legally take or execute the trusts of the will. *The will was executed in 1811, _ . and the testator died during that year. At the time of his death, the validity of the devise to trustees rested, therefore, upon the act of 1798, and this leads to a further examination of that act, in relation to its effect (alone and independent of the subsequent act of 1819), on the question whether it authorized a devise to aliens. There is no objection to the execution of a trust by an alien, excepting that which arises from his incapacity to hold lands.
 

 By the act of 1798, the alien grantee is authorized to have and to hold the lands granted to him in pursuance thereof, “to his, her or their heirs
 
 and assigns
 
 for ever, any plea of alienism to the contrary notwithstanding,” and the same word
 
 assigns
 
 is repeated in the proviso. Under this word
 
 assigns,
 
 a devisee is included (2 Shower 58); the word assigns includes the assignee of an assignee,
 
 in perpetuara,
 
 the heir of an assignee, and the assignee of an heir. (Jacob, Law Diet., Assigns.)
 

 In
 
 Aldrich
 
 v.
 
 Manton
 
 (13 Wend. 458), it was said by Nelson, C. J., that the heirs or assignees could not, under this act, convey the premises, so as to vest the estate in an alien. This may well be regarded as a
 
 dictum
 
 merely, because the decision of that case did not in any degree depend upon it; and if the act removes the disability of the alien heirs of the alien grantee, indefinitely, it removes also the disability of the assignee of the alien heir, because the heir and the assignee are both embraced in the same sentence; and the provision which affects the heir affects the assignee also. The power of selling, assigning and devising the land, is a
 
 *312
 
 power incident to the estate granted, and not created by the statute. The office and intent of the statute was to remove a disability, and not to create a power. And when we find, by the enabling clause of the act, that the land is to be held to the alien grantee and his assigns; and by the restraining clause, that the
 
 alien assigns
 
 of the grantee, and his heirs, are prevented from leasing the lands upon rent, the intention to remove the disability of alienism from assigns or purchasers, as well as from heirs, seems to .be clear. The devise, therefore, by Sir John Lowther Johnstone to trustees was valid, by virtue of this statute, without the aid of the statute of 1819.
 

 *The statute of 1819 is by its title, an act declaratory of the construction and intent of the act of 1798. Its first section is as follows: “ That all and every deed and deeds, conveyance and conveyances of or for any lands or tenements within this state, made to any alien or aliens, in pursuance of the act entitled An act to enable aliens to purchase and hold real estates within this state, under the restrictions therein mentioned/ passed the 2d day of April 1798, só far forth as relates to any question of alienism, shall be deemed and adjudged valid and effectual to vest all and singular the lands and tenements described in, and intended to be conveyed by, such deed or deeds, conveyance or conveyances, in the several grantees therein named, and their heirs and assigns, according to the nature of the estates thereby created, and in such manner as to authorize the said several grantees and their respective heirs and assigns, being aliens, effectually to give, devise, grant, sell and convey the same, in fee or otherwise, to any other alien or aliens, not being the subject or subjects of some sovereign state or power then at war with the United States of America, anything in the said act contained, or any plea of alienism, to the contrary notwithstanding.”
 

 The intent and meaning of the act of 1798, as ex
 
 *313
 
 plained by this statute, is in conformity with its true judicial construction so far, at least, as respects the question now in controversy. The act of 1819 operates upon the title to the land in dispute, by way of legislative construction of the previous statute, and removes whatever doubt may have previously existed as to the validity of the devise to alien trustees. The power of the legislature to pass the act of 1819 cannot be questioned, because if any right or title was impaired by it, it was the right and title of the state only. The act operated retrospectively, by declaring that conveyances made in pursuance of the act of 1798 should be adjudged valid and effectual, “ in such manner as to authorize the grantees and their respective heirs and assigns,
 
 being aliens,
 
 effectually to give, devise, grant, sell and convey the same to any other alien or aliens,” &c., and thus ^confirmed the validity of the devise in question, and cured whatever defects there may have ^ been in the title, by reason of the alienism of any of the parties to or through whom it passed.
 

 The release of Charles Herbert Pierpont to his co-trustees is a conveyance within the meaning of these statutes, and was a valid resignation of the trust; and the objection of alienism being removed, the appointment of Gordon as co-trustee in his place was also valid.
 

 The evidence of the defendants’ possession was sufficient to entitle the plaintiff to go to the jury on that point, and the defendant did not ask to go there with it. We cannot review the opinion of the judge on that question of fact.
 

 Judgment affirmed.
 
 [2]
 

 [1]
 

 The question was mooted in the court below, whether Charles Williamson was not an alien at the time of ihe conveyance to him; he was horn in Scotland, hut had held office in this state. On the trial, however, of a subsequent ejectment, involving the title to the Pulteney estate, it was shown (People v. Snyder, 41 N. Y. 403), that he had heen naturalized in the supreme court of Pennsylvania, on the 9th January 1792, several months prior to the date of Morris’s deed to him.
 

 [2]
 

 The title to the Pulteney estate was subsequently litigated in the cases of People
 
 v.
 
 Snyder, 41 N. Y. 397 ; s. c. 51 Barb. 589 ; and Howard v. Moot, 64 N. Y. 262 ; s. c 2 Hun 495 ; and in each of them, its validity was sustained.